Paul W. Kirchmaier v. Commissioner.
Paul W. Kirchmaier v. Commissioner
Docket No. 17159.
United States Tax Court
1949 Tax Ct. Memo LEXIS 231; 8 T.C.M. (CCH) 322; T.C.M. (RIA) 49083; March 29, 1949
*231 Petitioner in 1929 loaned securities valued at $32,968.75 for the purpose of securing the borrower's brokerage account, taking in return a demand promissory note in that amount. The borrower in 1930 allowed the securities to be used as collateral for a debt of a third party without petitioner's consent. The securities were subsequently sold to satisfy the third party's indebtedness and both he and the borrower, as a result of the stock market crash and the following depression, were rendered hopelessly insolvent in the early 1930's. Petitioner has never received any payment on the principal or interest of the note and in his income tax return for the calendar year 1944 claimed a deduction in the amount of $32,968.75 as a non-business bad debt. Held, that the non-business debt owed to petitioner became worthless in a year prior to 1944 and may not be deducted by the petitioner in that year under the provisions of section 23(k)(4) of the Internal Revenue Code. G. Charles Scharfy, Esq., and John J. Kendrick, Esq., Home Bank Bldg., Toledo, Ohio, for the petitioner. William R. Bagby, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion This proceeding involves a deficiency in income tax for the calendar year 1944 in the amount of $4,062.50. The sole issue presented is whether a non-business debt in the amount of $32,968.75 became worthless in 1944 and may be deducted by petitioner in that year under section 23(k)(4) of the Internal Revenue Code. The facts are found from a stipulation of the parties and evidence offered at the trial of the case. Findings of Fact Paul W. Kirchmaier, the petitioner herein, is an individual residing at 2115 Hawthorne Road, Toledo, Ohio. His Federal income tax return for the calendar year 1944 was filed with the collector of internal revenue for the 10th district of Ohio. On October 26, 1929, petitioner loaned to one *233 Frank S. Lewis the following securities which had cost petitioner the respective amounts shown: 100 shares, Columbia Gas and Electric
Co., common
$12,475.00
100 shares, National Supply Co., com-
mon
12,525.00
50 shares, Allis-Chalmers Manufac-
turinng Co., common
2,463.75
$5,000 U.S. Treasury Bonds, 4 1/4%,
1947/52
5,505.00
Total cost
$32,968.75
On October 26, 1929, Lewis executed and delivered to the petitioner his promissory note, payable on demand, in the amount of $32,968.75, bearing interest at the rate of five per cent per annum. This note represented the indebtedness of Lewis to the petitioner by reason of the loan of the securities. Lewis used the securities borrowed from petitioner in the protection of his joint brokerage account with Louis H. Gould at Collin, Norton & Company, stock brokers, Toledo, Ohio. After this account had been protected, Lewis permitted Gould to use the securities as collateral for the latter's personal indebtedness to the Commercial Savings Bank and Trust Company of Toledo, and on July 28, 1930, the securities in question were transferred from Collin, Norton & Company to the bank as collateral for Gould's indebtedness. *234 Gould's indebtedness to the Commercial Savings Bank and Trust Company was subsequently represented by a 90-day promissory note dated July 27, 1931, in the amount of $25,000, which was signed by Gould and his wife, Helen B. Gould. On or about August 17, 1931, the Superintendent of Banks of Ohio took possession of the business, properties, and assets of the Commercial Savings Bank and Trust Company and among its assets taken over by the Superintendent was the note secured by the securities previously obtained from the petitioner. The note of Louis H. Gould and Helen B. Gould was not paid when due and the Superintendent of Banks obtained a judgment against Gould in the Court of Common Pleas of Lucas County, Ohio, on or about October 30, 1931, and on November 13, 1931, the Superintendent of Banks sold the collateral, the proceeds of such sale being credited on the note and judgment. The loan of the securities by Lewis to Gould was made without the petitioner's knowledge or consent, petitioner having expected Lewis to return the securities after the latter's brokerage account had been protected. Frank S. Lewis lost very heavily as a result of the stock market crash in 1929 and the *235 collapse of real estate values. His liabilities in the early 1930's were more than one-half million dollars in excess of his assets. Louis H. Gould, also as a result of the 1929 crash, found himself with obligations amounting to approximately $800,000 in excess of his assets. On December 21, 1932, the following confessed judgments were rendered against Frank S. Lewis and Louis H. Gould in the Common Pleas Court of Lucas County, Ohio, and as to all of these judgments the sheriff of Lucas County on December 27, 1932, reported no property found on which to levy: Louis H. Guild and Frank S. Lewis.
$ 51,524.17
Louis H. Gould and Frank S. Lewis
7,506.35
Frank S. Lewis
5,356.67
Frank S. Lewis
1,282.50
Frank S. Lewis
2,147.00
Frank S. Lewis
21,355.00
Frank S. Lewis
2,147.00
Frank S. Lewis
7,566.50
Frank S. Lewis
6,485.00
$105,370.19
On March 17, 1942, the first two of the above judgments were assigned to Lehr Fess of Toledo, Ohio, who was associated with Lewis in the practice of law. The remaining judgments were assigned to Mrs. Frank S. Lewis on October 15, 1943. The securities in question have never been returned to petitioner nor has he received *236 repayment of any part of the $32,968.75 owing to him by Frank S. Lewis. Petitioner has never collected any interest from Lewis on this indebtedness. Frank S. Lewis, at the time of the loan and until his death in 1947, was one of the senior partners in the Toledo law firm of Doyle & Lewis, now Doyle, Lewis & Warner. This firm is one of the leading law firms in the city of Toledo and has always enjoyed a high reputation and represented large and substantial clients. Frank S. Lewis received from the law firm of which he was a partner the following amounts as his share of the partnership income for the stated years: Income from
Year
Law Firm
1938
$11,230.10
1939
12,975.17
1940
9,820.03
1941
12,921.48
1942
13,536.38
1943
13,941.20
1944
12,907.34
1945
7,672.56
1946
11,289.09
To May 27, 1947
4,494.80
Petitioner is, and has been since 1918, married to the former Virginia Jeanette Chesbrough. Frank S. Lewis was from 1909 until the time of his death married to the former Ethel Chesbrough. Virginia Kirchmaier and Ethel Lewis are sisters and the daughters of the late Abram Chesbrough. The father of Virginia and Ethel, upon his death on May 29, 1928, left *237 a trust with a value in excess of $1,500,000, the income from which was to be divided equally between Virginia and Ethel during their lives. Ethel Lewis also owned in her own right substantial properties of large value, among them a one-half interest in 26,000 acres of hardwood timber land in the northern peninsula of Michigan. The other one-half interest in this timber land was owned by Virginia Kirchmaier, her sister. As this land was non-productive and subject to high real estate taxes, the two sisters were anxious to dispose of it. Both the petitioner and Frank S. Lewis continuously from 1918 to 1944 attempted to sell this property. In 1937, petitioner was informed by Lewis that if he were able to consummate the sale of these lands he would use the commissions to repay the obligation owed to petitioner. Lewis was never able to effect such a sale and the petitioner in 1944 succeeded in negotiating the sale of all the timber land for approximately $600,000. Petitioner on July 25, 1940, entered into a contract with Howard Lewis, brother of Frank S. Lewis, whereby petitioner acquired the right to cut timber from these lands. Howard Lewis held only the bare legal title to a one-half *238 interest in these lands and held such title for the benefit of Ethel Lewis. This agreement provided for an advance payment by petitioner to Ethel Lewis of $40,000. Under an agreement with Frank S. Lewis, a credit was to be made by petitioner against the debt owed to him by Lewis to the extent of $22,000. On July 25, 1940, a check in the amount of $18,000, made payable to Ethel Lewis was sent by the petitioner to Frank S. Lewis as her agent and was deposited by his secretary in Mrs. Lewis' bank account. On the same date petitioner credited Frank S. Lewis with the payment of $22,000 on his note then held by petitioner. On January 15, 1942, Lewis wrote a letter to the petitioner in which he stated that Ethel Lewis refused to permit the deduction of $22,000 from the advance payment. In early 1944, petitioner was able to sell for $80,000 the timber land on which he had been cutting under the contract of July 25, 1940. As a result of this sale, petitioner ceased operations on the land and the 1940 contract was terminated. In view of Ethel Lewis' refusal to acquiesce in the arrangement between petitioner and her husband with respect to the $22,000 credited by petitioner on her husband's *239 note, petitioner on August 31, 1944, credited her account with the Chesbrough Lumber Company with $22,000 and debited his capital account in the same amount. On his personal books he reinstated $22,000 as being owed to him from Frank S. Lewis. Neither Frank S. Lewis nor Louis H. Gould ever went through bankruptcy or receivership and each over the years made continuous efforts to reduce his outstanding obligations. Throughout the period from 1929 to 1944, Lewis was reducing his indebtedness by way of compromise, paying in some cases as little as three cents to ten cents on the dollar. By September 1, 1944, Lewis had reduced his obligations to $286,314.51, which included $233,229.13 of notes and accounts payable to his wife. Louis H. Gould also succeeded in materially reducing his indebtedness during the same period. Following the stock market crash in 1929, he assumed the management of a stamping company in Toledo and built it up into a large concern which prior to his death was paying him compensation of between $30,000 and $35,000 per year. At the time of his death on September 9, 1944, Gould owed $177,000 as against assets at that time of between $4,000 and $5,000. Gould on *240 various occasions acknowledged his obligation to return or repay Lewis for the borrowed securities which Lewis had obtained from the petitione. In 1944, Lewis instructed members of his law firm to prepare the pleadings and institute court action to collect this indebtedness. The necessary papers were prepared but suit was never filed as Gould died on September 9, 1944. In the early part of 1944 Lewis, who was in his middle 60's, suffered severe heart attacks. Thereafter, he found it impossible to devote his full time to his law practice. As a result, his percentage of the firm's profits was successively reduced from 44 per cent in 1944 to 28 per cent and finally 13 per cent in later years. Frank S. Lewis died on May 27, 1947. Throughout the period from 1929 to 1944, petitioner made no effort to compromise the indebtedness owing to him from Lewis although he was aware that Lewis was compromising with other creditors. In response to the petitioner's request, Lewis, on September 1, 1944, supplied him with a financial statement listing liabilities of $286,314.51 and assets of $7,585.24. During the years here involved and at the present time, the Ohio General Code, section 11221, *241 provided as follows: "Contract in writing. An action upon a specialty or an agreement, contract or promise in writing shall be brought within fifteen years after the cause thereof accrued." The fifteenth year from the date of the execution of the note by Frank S. Lewis to petitioner on October 26, 1929, terminated on October 26, 1944. Section 11221 of the Ohio General Code is applicable to promissory notes. Petitioner never attempted to deduct the $32,968.75 owing from Lewis to himself on any Federal income tax return for any year prior to 1944. Respondent explains the disallowance of the bad debt deduction of $32,968.75 claimed by petitioner in 1944 as follows: "On your 1944 income tax return you claimed a net loss from the sale of capital assets in the amount of $26,160.58, limited to $1,000.00 under the provisions of Section 117(d) of the Internal Revenue Code. Included therein was an alleged bad debt of $32,968.75. It has been determined that this debt did not become worthless in the year 1944." Opinion ARUNDELL, Judge: The sole question presented is whether a debt in the amount of $32,968.75, owed by Frank S. Lewis to the petitioner since 1929, *242 became worthless in the year 1944 and may be deducted by petitioner in that year as a non-business bad debt within the provisions of section 23(k)(4) of the Internal Revenue Code. The issue is one of fact and in reaching its solution we need a practical approach, considering all the pertinent facts and circumstances regardless of their objective or subjective nature. Boehm v. Commissioner, 326 U.S. 287; Lucas v. American Code Co., 280 U.S. 445. Petitioner carries the burden of establishing that the debt became worthless during the year 1944. Redman v. Commissioner, 155 Fed. (2d) 319. The debt arises through the loan of securities and the indebtedness was evidenced by a note. Petitioner and Lewis were married to sisters. The securities loaned were to be used by Lewis as collateral to a brokerage account carried in the name of Lewis and Louis H. Gould, and it was understood between petitioner and Lewis that the securities were to be returned after they had served this purpose. But, instead, Lewis let his associate Gould have the securities transferred as security for a personal loan of Gould's with the Commercial Savings *243 Bank and Trust Company of Toledo. In 1931, the shares of stock were sold to pay Gould's indebtedness and the opportunity for their return to petitioner was forever lost. The stock market break of 1929 and the depression which followed in its wake completely broke Lewis and Gould and we find them by the year 1932, and perhaps sooner, hopelessly insolvent with Lewis owing more than $500,000 in excess of his assets and Gould with obligations amounting to approximately $800,000 in excess of his assets. By this time all the property of Lewis and Gould had been lost. But these debtors did not seek a discharge in bankruptcy and all they had left at the time was their earning capacity. It is to this earning power of Lewis' that the petitioner said he looked for the satisfaction of his loan, and so long as that remained it is contended that the indebtedness did not become worthless. It must be borne in mind that the loan made by petitioner to Lewis was not for the purpose of giving the latter a start in the practice of law, but was to save the speculative empire Lewis had built up and which began to totter with the market break and finally collapsed in the depths of the depression. All *244 that the loan sought to save was entirely lost by 1931 or 1932, and the creditors at that time would certainly have had to be incorrigible optimists if they expected to recover what was due them solely from the earning power of Lewis. We have set out in our findings what Lewis' earnings were from 1938 to 1946 and the testimony was that his earnings during this period were greater than in earlier years and yet his income during none of these years reached $14,000 and in some of the years was considerably less. It would appear that Lewis' earnings would not have sufficed to pay the interest on his debts let alone pay off the principal. There is no evidence of Lewis' paying any of his creditors in full, but it does appear that he bought up at from three cents to ten cents on the dollar some of the accounts, and in one instance it was testified that he paid twenty-five cents on the dollar. Petitioner's claim was not preferred and we cannot presume that his chances of collection were brighter than those of the other creditors. Nor can we indulge the presumption that Lewis was working to the end of paying his brother-in-law while not honoring his debts to others. The fact is Lewis never *245 paid petitioner a cent of either principal or interest, and in our judgment petitioner had no reasonable basis for expecting payment for many years prior to 1944. Under the statute, debts are to be charged off in the year of their worthlessness and we cannot see how the creditors of Lewis, as far back as 1932, could have been denied the right to charge off these debts. The loans were made on the security of assets and a business that had been lost in the depression. There may be circumstances where the earning power of a debtor must be considered in connection with the determination of worthlessness of a debt, but it has never been held that a creditor must await the death or retirement of a debtor before he may charge off a long overdue debt where the loan was made on an enterprise or transaction which has long since ceased to exist. The testimony relating to the possibility of Lewis securing a windfall by way of a commission on the sale of some timber land owned by his wife which would enable him to pay petitioner is to us not impressive. Nor does it appear that Lewis' wife, a woman of large means, was willing to have her money used to pay her husband's indebtedness to petitioner, *246 and in the one instance where an attempt was made to use Mrs. Lewis' money for such a purpose, she promptly put a stop to it. From what we have already said, we do not mean that from early 1930 until 1944 there existed not the slightest possibility that some payment on the note would be made, but it is not our understanding that such a situation must arise to render a debt worthless under section 23(k). The recovery of debts heretofore charged off is a common experience in the business world. The fact that the creditors were willing to compromise the indebtedness of Lewis for as little as three cents on the dollar demonstrates more the worthlessness of Lewis' debt than the existence of a real possibility that any of his creditors would eventually be repaid in a substantial amount. In our opinion, a fair appraisal of the evidence shows that the debt in question became worthless at least as early as 1932 when Lewis was wiped out by the depression and found himself insolvent by over $500,000. Decision will be entered for the respondent.